UNITED STATES of America, Appellee,

v.

Frank LOCASCIO, and John Gotti, Defendants–Appellants.

Nos. 817, 931, 1305 and 1782, Dockets 92–1382, 92–1384, 92–1671 and 93–1181.

United States Court of Appeals, Second Circuit.

Argued June 17, 1993.

Decided Oct. 8, 1993.

John Gleeson, James Orenstein, Asst. U.S. Attys.; New York City (Mary Jo White, U.S. Atty., E.D.N.Y., New York City, David C. James, Asst. U.S. Atty., E.D.N.Y., New York City, of counsel), for appellee.

Charles Ogletree, Boston, MA (Ephraim Margolin, Margolin, Arguimbau & Battson, San Francisco, CA, of counsel), for defendant-appellant John Gotti.

Michael E. Tigar, Austin, TX (Dennis P. Riordan, Riordan & Rosenthal, San Francisco, CA, Michael Kennedy, Michael Kennedy, P.C., New York City, of counsel), for defendant-appellant Frank Locascio.

Before: KEARSE, MINER, and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendants-appellants John Gotti and Frank Locascio appeal from judgments of conviction entered on June 23, 1992 in the United States District Court for the Eastern District of New York (Glasser, *J.*). They also appeal from the district court's October 30, 1992 order denying their motion for a new trial and a subsequent denial of a renewed motion for a new trial.

Gotti and Locascio were convicted after a jury trial of substantive and conspiracy violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c) and (d) (1988), and various predicate acts charged as separate counts. They were each principally sentenced to life imprisonment. The charges stemmed from their involvement with the Gambino Crime Family of La Cosa Nostra, an extensive criminal organization.

On appeal, Gotti and Locascio raise numerous challenges to their convictions and the subsequent denial of their motion for a new trial. For the reasons stated below, we affirm the judgments of the district court.

## BACKGROUND

On July 18, 1991, a grand jury in the Eastern District of New York returned a thirteen count superseding indictment against Gotti and Locascio. The indictment also named two other defendants, Salvatore Gravano and Thomas Gambino, who are not parties to this appeal. All four defendants were charged with violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)–(d) (1988), for unlawfully conducting and participating in the affairs of a criminal enterprise through a pattern of racketeering activity. The charged enterprise was the Gambino Organized Crime Family of La Cosa Nostra ("the Gambinos," "The Gambino Family," or "the Gambino Crime Family"). Gotti was charged as the head of the organization, and Locascio was accused of being the "underboss," or second-in-command.

Gravano was charged as the "consigliere," or advisor, to Gotti. Following the indictment, Gravano pleaded guilty to a superseding racketeering charge and testified at length at trial against Gotti and Locascio. The charges against Gambino, a "captain" in the· organization, were· severed.

Counts One and Two of the indictment charged Gotti and Locascio with the substantive and conspiracy violations of RICO. Many of the crimes charged as racketeering acts in the RICO counts were also the basis of separate counts in the indictment. Gotti was charged with the following predicate acts: the conspiracy to murder and the murder of Paul Castellano; the murder of Thomas Bilotti; the conspiracy to murder and the murder of Robert DiBernardo; the conspiracy to murder and· the murder of Liborio Milito; and obstruction of justice at the Thomas Gambino trial. Gotti and Locascio were both charged with the following predicate acts: the conspiracy to murder and the murder of Louis DiBono; the conspiracy to murder Gaetano Vastola; conducting an illegal gambling business in Queens, New York; conducting an illegal gambling business in Connecticut; conspiracy to make extortionate extensions of credit; and obstruction of justice in the investigation of the Castellano murder. Gotti and Locascio were also

charged in separate counts for a conspiracy to obstruct grand jury investigations, bribery of a public servant, and a conspiracy to defraud the United States.

Gotti and Locascio were tried before a sequestered anonymous jury in the United States District Court for the Eastern District of New York (Glasser, *J.*). Prior to trial, there were numerous government and defense motions, most of which need not be recounted at length. The motions that are the subject of this appeal included: the government's successful motion to sequester an anonymous jury; the government's successful motion to disqualify counsel for both Gotti and Locascio for various conflicts of interest; and Locascio's unsuccessful motion to sever his trial from Gotti's.

Trial began in February 1992. The government's proof to support the allegations that Gotti and Locascio had been in command of an extensive criminal enterprise was comprised mostly of lawfully intercepted tape-recorded conversations of the defendants-appellants and other alleged members of the Gambino Family. The government introduced tape recordings from four different locations over an eight-year period.

The most significant evidence consisted of conversations intercepted at 247 Mulberry Street in New York during the period from late 1989 until early 1990. The government had installed three listening devices in that building: in the Ravenite Social Club on the first floor, in a hallway behind the club's rear door, and in an apartment two stories above the club ("the Ravenite Apartment"). It was this last location that proved the most fruitful for the government, and the most damaging for the defendants-appellants. In the discussions in the Ravenite Apartment, Gotti, Locascio, and other Gambino Family members discussed various illegal acts. These discussions formed the core of the proof against the defendants-appellants at trial. Another major source of evidence was the testimony of Salvatore Gravano, who cooperated with the government following the indictment. As a high-level insider in the Gambino Family, Gravano's testimony was especially damaging.

The tape recordings, combined with Gravano's testimony, presented to the jury a picture of a large-scale enterprise involved in various criminal activities. The jury heard evidence on the structure and inner workings of the Gambino Family, and learned of the miscellaneous crimes with which Gotti and Locascio were charged: murders, obstruction of legal proceedings, conspiracies, gambling operations, and loansharking activities. It is unnecessary to recount the evidence in detail at this point, since much of it is unnecessary for full understanding of the issues on appeal.

Following a six-week trial, the jury found Gotti guilty of all charges in the indictment. Locascio was found guilty of all charges except the count relating to a gambling operation in Queens, New York. Each defendant-appellant was sentenced by the district court to life in prison on the RICO and murder counts, and the statutory maximum prison terms on all remaining counts, with all sentences to run concurrently. The court also imposed five years of supervised release, a $250,000 fine on each defendant, and mandatory special assessments.

Several months after sentencing, government attorneys discovered previously undiscovered reports that potentially pertained to Gravano's credibility. The government turned over those reports to the defendants-appellants, who subsequently moved for a new trial pursuant to Fed.R.Crim.P. 33, on the ground that the government had not disclosed relevant evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This motion and a later renewed motion were both denied by the district court.

On appeal, Gotti and Locascio raise myriad challenges to their convictions and to the subsequent denial of their new trial motions. They contend that the district court erred in: (1) disqualifying counsel for both Gotti and Locascio for conflicts of interest; (2) allowing certain government expert testimony; (3) instructing the jury; (4) allowing evidence of other crimes that were inadmissible against them; (5) impanelling an anonymous sequestered jury; (6) refusing to sever Locascio's trial; and (7) denying a motion for a new

trial based on the government's suppression of material relating to Gravano's credibility. The defendants-appellants also argue that they were denied a fair trial based on the government's suppression of exculpatory evidence and prosecutorial misconduct.

For the following reasons, we affirm the judgment of the district court.

## I. *Disqualification of Counsel*

Prior to trial, the district court disqualified attorneys for both Gotti and Locascio. Gotti and Locascio now contend that these disqualifications were unwarranted and violated their Sixth Amendment rights.

### A. *Applicable Law*

The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The accused, however, does not have the absolute right to counsel of her own choosing. *See Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). As the Court stated in *Wheat,*

> while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Id.* Similarly, although a criminal defendant can waive her Sixth Amendment rights in some circumstances, that right to waiver is not absolute, since "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160, 108 S.Ct. at 1698. The question of disqualification therefore implicates not only the Sixth Amendment right of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial. *See id.*

In deciding a motion for disqualification, the district court recognizes a presumption in favor of the accused's chosen counsel, although this presumption can be overcome by a showing of an actual conflict or potentially serious conflict. *See id.* at 164, 108 S.Ct. at 1699; *United States ex rel. Stewart v. Kelly,* 870 F.2d 854, 856 (2d Cir. 1989). We accord the district court's decision to disqualify an attorney "substantial latitude," and review the decision only for an abuse of discretion. *Wheat,* 486 U.S. at 163–64, 108 S.Ct. at 1699.

There are many situations in which a district court can determine that disqualification of counsel is necessary. The most typical is where the district court finds a potential or actual conflict in the chosen attorney's representation of the accused, either in a multiple representation situation, *see Wheat,* 486 U.S. at 159–60, 108 S.Ct. at 1697–98; *United States v. DiTommaso,* 817 F.2d 201, 219 (2d Cir.1987); *United States v. Curcio,* 680 F.2d 881, 886 (2d Cir.1982), or because of the counsel's prior representation of a witness or co-defendant, *see Stewart,* 870 F.2d at 856–57. Courts have also considered disqualification where the chosen counsel is implicated in the allegations against the accused and could become an unsworn witness for the accused, *see United States v. Arrington,* 867 F.2d 122, 129 (2d Cir.), *cert. denied,* 493 U.S. 817, 110 S.Ct. 70, 107 L.Ed.2d 37 (1989); *United States v. Kwang Fu Peng,* 766 F.2d 82, 87 (2d Cir.1985), or where the chosen counsel is somehow unable to serve without unreasonable delay or inconvenience in completing the trial, *see United States v. Scopo,* 861 F.2d 339, 344 (2d Cir.1988), *cert. denied,* 490 U.S. 1048, 109 S.Ct. 1957, 104 L.Ed.2d 426 (1989).

In this case, the government moved to disqualify attorneys for both Gotti and Locascio on multiple theories. We consider each of the defendants-appellants in turn.

### B. *Gotti*

#### 1. *Background*

Bruce Cutler served as Gotti's attorney in previous criminal trials in federal court. Prior to trial, the government moved to disquali-

fy Cutler from acting as Gotti's attorney. Although the motion also dealt with the disqualification of other Gotti attorneys, only the disqualification of Cutler has been challenged on appeal.

The district court granted the motion to disqualify on several grounds. *United States v. Gotti*, 771 F.Supp. 552 (E.D.N.Y.1991). Judge Glasser, in a thoughtful and well-reasoned opinion, found that Cutler had acted as "house counsel" to the Gambino Crime Family by receiving "benefactor payments" from Gotti to represent others in the criminal enterprise. *Id.* at 560. The district court based this conclusion on excerpts from the government's taped transcripts, which left "little doubt that Gotti paid significant sums of money for legal services rendered to others." *Id.*

The district court further determined that Cutler's participation in government-taped conversations at which illegal activity was discussed would impair his representation of Gotti. *Id.* at 562–63. Specifically, the court noted that Cutler's mere presence at trial could make him an "unsworn witness" before the jury in explaining his own conduct and interpreting Gotti's conversations on the tapes. *Id.* at 563. Even if Gotti waived the conflict, and even if the government did not intend to call Cutler as a witness, the district court found that Cutler's representation would still compromise the integrity of the proceeding. *Id.*

Third, the district court found that Cutler's prior representation of Michael Coiro, a potential government witness, gave rise to a conflict of interest. *Id.* The court reasoned that this conflict mandated disqualification both because Cutler was privy to events surrounding an obstruction charge, and because Cutler's cross examination of Coiro at trial would be circumscribed by the prior representation. *Id.* at 563–65.

Finally, the district court also found disqualification warranted because of the implication by Gotti in taped conversations that he had paid Cutler money "under the table." *Id.* at 565. This made Cutler a potential accomplice as well as a potential witness to Gotti's tax fraud.

In conclusion, the district court noted that it was mindful that disqualification is a drastic remedy for conflict problems, but that no less severe alternatives were viable. *Id.* at 566. The court therefore held that "the grave peril the continued representation by [Cutler] poses to the integrity of the trial process" mandated disqualification. *Id.*

 Gotti now appeals the district court's ruling, arguing that the disqualification was an abuse of discretion. We disagree, and affirm the disqualification on two grounds: (1) Cutler's role as house counsel to the Gambino Crime Family; and (2) Cutler's anticipated role as an "unsworn witness" for Gotti had he been allowed to serve. We note that, importantly, Gotti does not challenge the effectiveness of his replacement trial counsel. Although the government cannot justify an otherwise unwarranted disqualification by arguing that the disqualification did not result in the accused receiving ineffective assistance of counsel, *see United States v. Diozzi*, 807 F.2d 10, 16 (1st Cir.1986), the fact that Gotti received more than competent representation is an additional consideration strongly supporting the district court's otherwise entirely correct ruling.

### 2. *Cutler's Role as House Counsel*

 Gotti argues that the facts before the district court did not merit the conclusion that Cutler had acted as "house counsel" to the Gambino Crime Family. Rather, Gotti argues that Cutler was merely his personal attorney.

Ethical considerations warn against an attorney accepting fees from someone other than her client. As we stated in a different context, the acceptance of such "benefactor payments" "may subject an attorney to undesirable outside influence" and raises an ethical question "as to whether the attorney's loyalties are with the client or the payor." *In re Grand Jury Subpoena Served Upon John Doe*, 781 F.2d 238, 248 n. 6 (2d Cir. 1985) (in *banc*), *cert. denied*, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986). In this context, proof of house counsel can be used by the government to help establish the existence of the criminal enterprise under RICO, by showing the connections among

the participants. *See United States v. Simmons*, 923 F.2d 934, 949 (2d Cir.) (holding that government can use evidence of benefactor payments to prove existence of enterprise), *cert. denied*, —— U.S. ——, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991); *United States v. Castellano*, 610 F.Supp. 1151 (S.D.N.Y. 1985) (disqualifying attorney because attorney's acceptance of benefactor payments could be used to prove existence of enterprise).

Contrary to Gotti's assertions, there was sufficient evidence for the district court to determine that Cutler had acted as house counsel to the Gambino Crime Family. For example, the court cited one conversation in which Gotti, in the time-honored tradition of legal clients, complained about his legal fees:

> I gave youse [sic] 300,000 in one year. Youse [sic] didn't defend me. I wasn't even mentioned in none of these [expletive deleted] things. I had nothing to do with none of these [expletive deleted] people. What the [expletive deleted] is your "beef?" ... Before youse [sic] made a court appearance, youse [sic] got 40,000, 30,000 and 25,000. That's without counting [attorney] John Pollok.... You standing there in the hallway with me last night, and you're plucking me.... "Tony Lee's" lawyer, but you're plucking me. I'm paying for it.... Where does it end? Gambino Crime Family? This is the Shargel, Cutler and who do you call it Crime Family.

771 F.Supp. at 555. Gotti thus demonstrated that he was incurring the legal fees for representation of others. As support for disqualification, the government indicated that it would introduce the testimony of Michael Coiro, who would testify that he had paid nothing to Cutler and another attorney for their services to him, presumably because Gotti paid for his defense.

Cutler's role as house counsel to the Gambinos raised a credible issue of the ethical propriety of his representation of Gotti in this case. An attorney cannot properly serve two masters, and the evidence before the district court indicated that Cutler had represented the Gambino Family as a whole. Moreover, Cutler's status as house counsel

was potentially part of the proof of the Gambino criminal enterprise. We cannot say that the district court abused its discretion in disqualifying Cutler on this basis, considering the volume of proof of Cutler's proximity to the affairs of the Gambino Crime Family offered by the government in this case.

### 3. *Cutler's Role as an Unsworn Witness*

■ An even stronger basis for disqualification, however, was the possibility that Cutler would function in his representational capacity as an unsworn witness for Gotti. An attorney acts as an unsworn witness when his relationship to his client results in his having first-hand knowledge of the events presented at trial. If the attorney is in a position to be a witness, ethical codes may require him to withdraw his representation. *See* Model Code of Professional Responsibility DR 5–102(A) (1992).

Even if the attorney is not called, however, he can still be disqualified, since his performance as an advocate can be impaired by his relationship to the events in question. For example, the attorney may be constrained from making certain arguments on behalf of his client because of his own involvement, or may be tempted to minimize his own conduct at the expense of his client. Moreover, his role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination. *See United States v. McKeon*, 738 F.2d 26, 34–35 (2d Cir.1984) (requiring disqualification where attorney would be essentially acting as both an advocate and a witness); *United States v. Cunningham*, 672 F.2d 1064, 1075 (2d Cir.1982) (upholding disqualification where an attorney would act as an unsworn witness for defendant); *Castellano*, 610 F.Supp. at 1167 (finding that attorney's appearance at counsel table would itself distort the factfinding process).

■ This is different from the situation in *Wheat*, since the conflict in *Wheat*—multiple representation—was a conflict inuring to the detriment of the accused. In such a case, waiver by the accused of the conflict can

conceivably alleviate the constitutional defect, so long as the representation by counsel does not seriously compromise the integrity of the judicial process. When an attorney is an unsworn witness, however, the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired. Waiver by the defendant is ineffective in curing the impropriety in such situations, since he is not the party prejudiced. See Cunningham, 672 F.2d at 1074–75.

The district court disqualified Cutler partially on the ground that his representation of Gotti would place him in the role of such an unsworn witness. The clearest support for this finding was Cutler's presence during the Ravenite Apartment discussions taped by the government. The government was legitimately concerned that, when Cutler argued before the jury for a particular interpretation of the tapes, his interpretation would be given added credibility due to his presence in the room when the statements were made. This would have given Gotti an unfair advantage, since Cutler would not have had to take an oath in presenting his interpretation, but could merely frame it in the form of legal argument.

Gotti argues, however, that the district court erred in disqualifying Cutler where the government had no intention of calling Cutler. He also maintains that Cutler's presence and participation on the government's tapes could have been redacted to eliminate references to and statements by Cutler, thereby eliminating the unsworn witness problem. The first contention is meritless, since the district court explicitly and correctly noted that "whether the government will or will not call ... Cutler ... has no significance for this motion." 771 F.Supp. at 562. The second contention is equally unavailing, since the district court explicitly found that redaction of the tapes would have eviscerated the government's case. We are not in a position to second-guess the district court's clearly supported factual findings on review. Moreover, we agree with the district court that the government's case should not be unfairly impaired so that an accused can continue with conflicted counsel.

The unsworn witness problem arises not only in relation to the Ravenite tapes, but to other grounds cited by the district court in support of disqualification. For example, the court found that Gotti's references to Cutler's acceptance of fees "under the table" were relevant to the government's case on the tax fraud count. Had Cutler argued Gotti's defense to that count, he would not only have had a conflict of interest but he would have been arguing as to events in which he was allegedly involved.

We are aware that disqualification is a drastic remedy to the unsworn witness problem. We are also, however, cognizant that this is an unusual case, in that Cutler had allegedly entangled himself to an extraordinary degree in the activities of the Gambino Crime Family: he is recorded on government tapes when discussions of allegedly illegal activity took place; he is allegedly involved in the tax fraud count against Gotti; his role as house counsel could be used to prove the criminal enterprise; and his representation of government witnesses caused a conflict with his representation of Gotti. Although we are cognizant of the right of the accused to secure representation, we are also conscious of the institutional interest in protecting the integrity of the judicial process. If an attorney will not perform his ethical duty, it is up to the courts to perform it for him. Bruce Cutler had no place representing John Gotti in this case, and the district court properly determined that he should be disqualified.

### C. Locascio

Locascio challenges the district court's disqualification of attorney George Santangelo, arguing that the district court abused its discretion in disqualifying Santangelo. Santangelo was disqualified for much the same reasons as Cutler: (1) because Santangelo was house counsel to the Gambino Crime Family; and (2) because Santangelo could conceivably become an unsworn witness if he represented Locascio.

### 1. Background

On January 6, 1992, thirteen months after Locascio's indictment, Santangelo filed a no-

tice of appearance on behalf of Locascio. The government quickly moved for disqualification. The motion was argued on January 17, 1992 and granted four days later. *United States v. Gotti,* 782 F.Supp. 737 (E.D.N.Y. 1992).

The district court began by reviewing the evidence presented by the government that Santangelo was house counsel to the Gambino Family. The court noted that Gravano was expected to testify that, after arraignment, Gotti had stated to him that Gotti was going to assign Santangelo to represent either Gravano or Locascio. Gravano was also expected to testify that Gotti controlled the actions of attorneys answerable to him, in the interests not of the individual clients but of the Gambino Family. The court found that this testimony would support the inference that Santangelo was "answerable to Gotti," which was probative of the charged RICO enterprise. The court also reviewed intercepted conversations presented by the government that supported Gravano's allegations that Gotti controlled Santangelo. The district court concluded:

> Santangelo's relationship to Gotti and to Gotti's associates is properly the object of proof by the government in its case in chief. But, as with Cutler, ... Santangelo cannot present himself as counsel for the defendants when his relationship to those defendants is itself an issue under the consideration of the jury. His presence at counsel table could readily serve as a signal to the jury that the court discounts the government's proof on this point—that the court does not believe this evidence. Moreover, Santangelo could not argue against the existence of the charged RICO enterprise without becoming an unsworn witness.

*Id.* at 741.

### 2. *Discussion*

We have already discussed the applicable law on the issue of counsel disqualification. *See supra* § I.A. Locascio offers the same arguments that we rejected in our discussion of the disqualification of Bruce Cutler. Simply put, Locascio recharacterizes the record and disagrees that the government proffered evidence to the district court that merits disqualification of Santangelo.

As in our discussion of Cutler's disqualification, we review the district court's rulings only for an abuse of discretion. *Wheat,* 486 U.S. at 163–64, 108 S.Ct. at 1699; *Stewart,* 870 F.2d at 856. Here, the district court specifically found that Gravano's testimony and the intercepted conversations substantiated the argument that Santangelo was house counsel. This raised two serious conflicts of interest: first, that Santangelo's previous representations of Gambino Family members would be used to prove the existence of the enterprise; and second, that his loyalty to Locascio would be compromised by his relationship to Gotti. These findings were supported in the record, and Locascio's recharacterization of the record does not compel us to reverse them.

As discussed previously, Locascio's Sixth Amendment concerns are not the only interests at stake here: the district court has an independent duty to protect the integrity of the judicial process, and the government has its own fair trial interests that should not be unnecessarily impaired so that Locascio can enjoy the services of ethically compromised counsel. This is especially true in these circumstances, since Locascio suffered no prejudice from the disqualification of Santangelo. Although actual prejudice is not determinative of the propriety of a disqualification, it is worth noting that this is not a case where an attorney worked on a case for months only to be disqualified on the eve of trial. Santangelo filed his first notice of appearance on January 6, 1992, and was disqualified fifteen days later. Locascio cannot argue this disqualification impacted his ability to prepare for trial.

### D. *Conclusion*

Although disqualification is a drastic measure, the district court is in the best position to evaluate what is needed to ensure a fair trial. Here, the district court made careful findings of fact on each disqualification, and supported its decisions with well-reasoned opinions. We conclude that the district court properly exercised its discretion in disqualifying Bruce Cutler and George Santangelo.

## II. *Admission of Expert Testimony*

Gotti and Locascio both contend that the district court committed reversible error in admitting the testimony of government experts to assist the jury in understanding the structure of organized crime families. More specifically, they principally challenge various facets of FBI Agent Lewis Schiliro's testimony, arguing that: (1) Schiliro's testimony was too broad and went beyond the scope of expert testimony; (2) he was not properly qualified as an expert; (3) his use of hearsay and un-introduced evidence to substantiate his opinions violated Fed.R.Evid. 703, as well as the Confrontation Clause; and (4) the availability of similar testimony by an accomplice witness rendered his testimony unnecessary.

### A. *Background*

At trial, Special Agent Schiliro testified at great length on the nature and function of organized crime families, imparting the structure of such families and disclosing the "rules" of the La Cosa Nostra. For example, Schiliro testified that a "boss" must approve all illegal activity and especially all murders, and that the functions of the "consigliere" and "underboss" are only "advisory" to the "boss." In addition, as part of his testimony, he interpreted the numerous surreptitiously taped conversations introduced into evidence, and identified the individuals speaking by their voices. Schiliro specifically named John Gotti as the boss of the alleged Gambino Family and Gravano as the consigliere. Additionally, he identified, together with their titles, ranks, and functions, numerous members and associates of the Gambino Family and other criminal organizations. When pressed about his sources for individuals' titles, ranks, and functions, Schiliro admitted that his sources of information were not necessarily before the court.

### B. *Discussion*

■ Under the Federal Rules of Evidence, an expert is permitted to testify in the form of an opinion or otherwise when that testimony would "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. In deter-

mining whether such evidence will assist the jury, the district court must make a " 'common sense inquiry' " into " 'whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.' " Fed.R.Evid. 702, advisory committee note, (quoting Ladd, *Expert Testimony,* 5 Vand.L.Rev. 414, 418 (1952)), *quoted in United States v. Onumonu,* 967 F.2d 782, 788 (2d Cir.1992). In applying this standard, the district court has broad discretion regarding the admission of expert testimony, and this Court will sustain the admission unless "manifestly erroneous." *United States v. DiDomenico,* 985 F.2d 1159, 1163 (2d Cir.1993); *United States v. Rivera,* 971 F.2d 876, 887 (2d Cir.1992).

Gotti and Locascio contend that the district court erred in admitting Schiliro's testimony for several reasons. The thrust of their argument is that Schiliro did not actually testify as an expert, but rather was simply a conduit allowing inadmissible evidence and arguments to flow into the court. They assert that Schiliro's testimony was too broad, sweeping, and unsubstantiated to be admissible. We will consider their specific points in turn.

### 1. *Challenge to Scope of Expert Testimony*

■ The defendants-appellants challenge the admission of expert testimony on the inner workings of the Gambino Family as being outside the scope of expert testimony. We have, however, previously upheld the use of expert testimony to help explain the operation, structure, membership, and terminology of organized crime families. *See United States v. Daly,* 842 F.2d 1380, 1388 (2d Cir.), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *see also United States v. Skowronski,* 968 F.2d 242, 246 (2d Cir.1992) (upholding expert testimony ·of government agents explaining organized crime jargon); *United States v. Tutino,* 883 F.2d 1125, 1134 (2d Cir.1989) (same), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *United States v. Ardito,* 782 F.2d

358, 363 (2d Cir.) (same), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1792, 90 L.Ed.2d 338 (1986); *United States v. Gallo*, 118 F.R.D. 316, 317–18 (E.D.N.Y.1987) (FBI agents could testify as experts as to methods of operation of organized crime). Other circuits considering the issue are in agreement. *See United States v. Pungitore*, 910 F.2d 1084, 1148–49 (3d Cir.1990) (upholding testimony of agent who testified about structure of organized crime families), *cert. denied*, —— U.S. ——, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991); *United States v. Angiulo*, 847 F.2d 956, 973–75 (1st Cir.) (same), *cert. denied*, 488 U.S. 852, 109 S.Ct. 138, 102 L.Ed.2d 110 (1988).

In *Daly*, this Court confronted a similar claim that a district court committed reversible error in admitting expert testimony on the structure of organized crime families. There, the government agent who testified "identified the five organized crime families that operate in the New York area; he described their requirements for membership, their rules of conduct and code of silence, and the meaning of certain jargon, ... and he described how, in general, organized crime has infiltrated labor unions." 842 F.2d at 1388. Additionally, the expert identified voices on surveillance tapes. In sustaining the admission of such testimony, we explained that such expert testimony "was relevant to provide the jury with an understanding of the nature and structure of organized crime families." *Id.* We further added that there was "no question that there was much that was outside the expectable realm of knowledge of the average juror." *Id.*

We continue to believe that despite the unfortunate fact that our society has become increasingly familiar with organized crime and its activities from such sources as newspapers, movies, television, and books, it is still a reasonable assumption that jurors are not well versed in the structure and methods of organized crime families. Moreover, much of the information gleaned from such sources may be inaccurate. Consequently, the subject matter of Agent Schiliro's testimony, namely the structure and operations of organized crime families, was properly admitted.

*2. Schiliro's Qualifications as an Expert*

■ The defendants-appellants argue that Schiliro was not properly qualified as an expert, since his testimony required knowledge of linguistics, the sociology of crime, tape recording technology, and voice analysis. Gotti and Locascio contend that because he was not an expert in any of those areas, he was not qualified to interpret tapes or give his opinion on the Gambino Family structure.

This argument ignores the fact that Schiliro had been an FBI agent for seventeen years, and for five years had been on the FBI's Organized Crime Program, a squad that investigated only organized crime cases. For more than two years, he was the supervisor of the Organized Crime Program. Rule 702 only requires that an expert witness have "scientific, technical, or other specialized knowledge" gained through "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Because Schiliro's background qualifies as "specialized knowledge," the district court did not err in qualifying him as an expert. *See United States v. Simmons*, 923 F.2d 934, 946 (2d Cir.) (holding that a veteran DEA agent was "well-suited" to offer expert testimony about coded narcotics terminology), *cert. denied*, —— U.S. ——, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991); *United States v. Roldan–Zapata*, 916 F.2d 795, 804–05 (2d Cir.1990) (holding that a narcotics investigator was properly qualified to testify about "the narcotics-related nature" of items found in a defendant's apartment and about "drug trafficking techniques generally"), *cert. denied*, 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991). Schiliro did not need to be a voice analysis expert to be able to recognize the defendants-appellants' voices on the tapes, nor did he need a linguistics degree to understand what was being said. Schiliro testified as an expert on organized crime, and he was sufficiently qualified on that basis. Although he had never before been qualified as an expert witness, even the most qualified expert must have his first day in court.

*3. Sources of Information*

■ Defendants-appellants next argue that because Schiliro relied upon "countless

nameless informers and countless tapes not in evidence," his testimony violated Fed. R.Evid. 703 and the Confrontation Clause of the Sixth Amendment. The government responds that, although Schiliro relied upon information that was not before the court, this reliance is permitted under the rules of evidence.

According to Rule 703, the facts that form the basis for an expert's opinions or inferences need not be admissible in evidence "[i]f of a type *reasonably relied* upon by experts in the particular field." Fed.R.Evid. 703 (emphasis added). Thus, expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions. *See Daly,* 842 F.2d at 1387 (holding that organized crime expert can rely on otherwise inadmissible hearsay in forming his opinion); *cf. Reardon v. Manson,* 806 F.2d 39, 42 (2d Cir.1986) (holding that reliance by experts on information provided by others does not violate Sixth Amendment rights if expert is available for cross examination), *cert. denied,* 481 U.S. 1020, 107 S.Ct. 1903, 95 L.Ed.2d 509 (1987). Therefore, Schiliro was entitled to rely upon hearsay as to such matters as the structure and operating rules of organized crime families and the identification of specific voices heard on tape in forming his opinion, since there is little question that law enforcement agents routinely and reasonably rely upon such hearsay in the course of their duties. An expert who meets the test of Rule 702, as Schiliro does, is assumed "to have the skill to properly evaluate the hearsay, giving it probative force appropriate to the circumstances." *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1223, 1245 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2899, 101 L.Ed.2d 932 (1988). The fact that Schiliro relied upon inadmissible evidence is therefore less an issue of admissibility for the court than an issue of credibility for the jury. *See United States v. Young,* 745 F.2d 733, 761 (2d Cir. 1984) (pointing out that the defendants were free to expose the weaknesses in the prosecution's widespread use of expert testimony through cross examination), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).

Gotti and Locascio do not seriously contest the point that hearsay and other inadmissible evidence are often reasonably relied upon by law enforcement agents in the field, and that this reliance is anticipated by Rule 703. Rather, they argue that a district court admitting expert testimony based on inadmissible evidence must make an explicit finding that the underlying sources of information used by the expert are trustworthy. *See Barrel of Fun, Inc. v. States Farm Fire & Casualty Co.,* 739 F.2d 1028, 1033 (5th Cir.1984) (holding that an expert's testimony was inadmissible because the factual premises underlying the opinion were "inherently suspect"). We agree that a district court is not bound to accept expert testimony based on questionable data simply because other experts use such data in the field. The Supreme Court's recent decision of *Daubert v. Merrell Dow Pharmaceuticals Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), makes this clear. In *Daubert* the Court abandoned the traditional rule of *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir. 1923), which required "general acceptance" in the particular field before novel scientific evidence or techniques could be admitted in court. The Court in *Daubert* asserted that such a rigid standard for admitting expert scientific testimony was inconsistent with the liberal thrust of the federal rules, —— U.S. at ——, 113 S.Ct. at 2794, holding that district courts have the authority and discretion to determine whether novel scientific evidence is trustworthy. *Id.* at ——, 113 S.Ct. at 2796. Although *Daubert* involved Rule 702 and scientific evidence, the flexibility of the federal rules also applies to Rule 703 and the determination of the trustworthiness of the sources of expert testimony. The district court has broad discretion to decide the admissibility of expert testimony based on inadmissible evidence.

We decline, however, to shackle the district court with a mandatory and explicit trustworthiness analysis. The district judge, who has the ideal vantage point to evaluate an expert's testimony during trial, already has the authority under Fed.R.Evid. 403 to

conduct an explicit trustworthiness analysis should she deem one necessary. *See Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir.1984) (noting that the district court has the "discretionary right under Rule 703 to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony"). In fact, we assume that the district court consistently and continually performed a trustworthiness analysis *sub silentio* of all evidence introduced at trial. We will not, however, circumscribe this discretion by burdening the court with the necessity of making an explicit determination for all expert testimony. This is especially true in this case, because the sources relied upon by Schiliro are no different from those previously allowed by this Court. *See Daly*, 842 F.2d at 1387–88.

### 4. *Availability of Alternative Methods of Proof*

 Finally, the defendants-appellants argue that because an accomplice witness was available to provide similar testimony concerning the operations of organized crime families, the government was not permitted to introduce expert testimony on the subject. Rule 702, however, requires only that an expert have "some specialized knowledge that will assist the trier of fact." There is no requirement that prohibits a government agent from testifying as an expert merely because an accomplice witness is also available.

The defendants-appellants mistakenly rely upon *United States v. Long*, 917 F.2d 691 (2d Cir.1990), and *United States v. Castillo*, 924 F.2d 1227 (2d Cir.1991), to support their contention. In *Long*, we held that the district court abused its discretion by admitting expert testimony regarding organized crime, but only because the crimes alleged had merely a marginal connection to organized crime. 917 F.2d at 701–02. The present case is readily distinguishable in that the charges against the defendants-appellants are intimately related to organized crime. Similarly, in *Castillo*, this Court held that expert testimony had been erroneously admitted not because a lay witness could have

provided the same testimony, but because we concluded that the jury "was entirely capable of understanding the evidence before it and determining the facts in issue without [the expert's] assistance." 924 F.2d at 1233. The same cannot be said about this case.

### 5. *Other Challenges*

The defendants-appellants challenge the introduction of testimony from two other sources: FBI Agents George Mueller and George Gabriel. The record reflects, however, that neither of these witnesses testified as experts, and that neither defendant-appellant objected to their testimony when it was given. Therefore, we find no reason to disturb the district court's admission of their testimony.

### C. *Conclusion*

 Although we recognize the dangers inherent in the use of government experts in cases such as this one, we hold that the admission of such testimony was not manifestly erroneous. We remind the district courts, however, that they are not required to admit such testimony, and when they do the testimony should be carefully circumscribed to ensure that the expert does not usurp either the role of the judge in instructing on the law, or the role of the jury in applying the law to the facts before it. *Cf. United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991).

### III. *Jury Instructions*

 Gotti and Locascio make various challenges to the district court's instructions to the jury. We review those instructions *de novo*, and will only reverse on this basis if the defendants-appellants can show that the charge given, when read as a whole, caused them prejudice. *See United States v. Pujana–Mena*, 949 F.2d 24, 27 (2d Cir.1991).

### A. *Section 1959*

 Gotti argues that the district court erroneously instructed the jury on the murder and murder conspiracy counts. These

charges were founded on 18 U.S.C. § 1959, which provides:

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or *maintaining or increasing position* in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished....

18 U.S.C. § 1959(a) (emphasis added). The "maintaining or increasing" requirement is given its ordinary meaning and is "satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v. Concepcion,* 983 F.2d 369, 381 (2d Cir.1992).

Gotti argues, however, that the district court's instructions on the § 1959 counts were ambiguous, allowing him to be convicted even if the jury found that the murders were committed to advance someone else's position, not his own. Gotti's theory of defense was that many of the murders committed by Gambino Family associates were actually authorized by Gravano, the government witness, solely for his own purposes. Gotti argued to the jury that Gravano had orchestrated the murders to improve his own financial position, and that Gotti had nothing to do with them.

Gotti and Locascio focus on two parts of the instructions: (1) the court's language at the end of its instructions on the counts charging substantive violations of § 1959; and (2) the court's charge on the § 1959 conspiracy counts. For the reasons stated below, we find no basis for reversal, even though we recognize that the district court should have more clearly stated and reiterated the "maintaining or increasing position"

motive requirement of § 1959 in both the substantive and conspiracy counts.

### (1) *Language in the Substantive § 1959 Counts*

A review of the instruction reveals that the district court initially clearly instructed the jury that the government had to prove that Gotti and Locascio committed the murders in order to maintain or increase their respective positions in the enterprise. Referring to substantive counts four, six, and eight, the court specifically charged that

the fourth element that the Government must prove beyond a reasonable doubt is that the defendant's purpose in committing the murder was to maintain or increase his position in the racketeering enterprise. In determining whether a defendant's purpose in committing the murder was to maintain or increase his position in that enterprise, you should give the words "maintain" or "increase" their ordinary meaning. You should consider all the facts and circumstances in making that determination.

For example, you may consider evidence that the crime, if proved, was committed in order to maintain discipline within the enterprise and served to maintain the defendant's position with the enterprise.

If the defendant committed a crime because he thought it would enhance his position or prestige within the enterprise, or if he committed it because he thought it was necessary to maintain the position he already held in the enterprise, the element would be established.

These examples are only meant by way of illustration. They are not exhaustive.

These instructions are entirely consistent with the language in *Concepcion. See id.*

The district court's initial instructions on the substantive § 1959 counts, then, correctly reflected the government's burden to show that Gotti and Locascio acted to increase or maintain their respective positions in the enterprise. As the instructions continued, however, the district court unfortunately began to use a short-hand phrase to refer to the § 1959 motive requirement.

Toward the end of its instructions on the substantive § 1959 counts, the court summarized its § 1959 instructions without mentioning the maintaining-or-increasing-his-position motive and using instead the short-hand phrase "in aid of racketeering." The court said, "[i]n short," that the jury should convict on the substantive § 1959 count in question if it found that the government proved beyond a reasonable doubt that the defendant the jury was considering committed the crime of murder or aided or abetted the commission of that crime "in aid of racketeering." Since virtually all crimes could be committed "in aid of racketeering" without the motive of maintaining or increasing the perpetrator's position in the enterprise, this summary was unfortunately vague. Though the phraseology may be cumbersome, the district court should remind the jury of the position-related motivation requirement that is applicable to each § 1959 count.

Gotti and Locascio argue that the charge was fatally flawed because of the use of the "in aid of racketeering" language. The district court, however, only used the ambiguous short-hand language in the summary of the instruction, after having articulated the requirement correctly throughout the rest of the explanation of the counts. Moreover, the court gave the jurors the indictment, which alleged that Gotti and in some cases Locascio "together with others" conspired to murder and/or murdered four individuals "for the purpose of maintaining and increasing their positions in the Gambino Family." At the point when the district court lapsed into short-hand, the jury was already well aware of the motive requirement.

### (2) *Language on the § 1959 Conspiracy Counts*

█ In the district court's instructions on the § 1959 conspiracy counts, the court again used language that blurred the § 1959 motive requirement. As with the substantive counts, the court began by informing the jury of the charge in the indictment and of the statutory provision, both of which include the "maintaining or increasing position" clause.

In proceeding to instruct the jury as to what it needed to find in order to convict on these counts, though, the court again used its "in aid of racketeering" catch phrase. The court did not at that point expressly advise the jury that, in order to convict on the § 1959 conspiracy counts, the jury was required to find that the defendant in question conspired to commit murder for the purpose of maintaining or increasing his position in the enterprise.

At another point, when instructing the jury as to the nature of the alleged conspiracy, the court often used a short-hand phrase with respect to the object of the conspiracy that did not adequately reflect the need for proof of a position-related purpose. For example, the court instructed that a "conspiracy is defined very simply as an agreement between two or more persons to commit a crime" and that

> [i]t is enough if the Government proved two or more persons, one of whom being the defendant you are considering in any way, either expressly or impliedly, came to a common understanding *to commit a crime to violate the law*....

(emphasis added). The court also concluded using the short-hand:

> Summing up then, the essential elements of the offense charged in counts three, five, seven and nine, conspiracy to murder *in aid of racketeering*, each of which the Government must prove beyond a reasonable doubt are:
>
> First, that [a] conspiracy existed. That is two or more people, one of whom is the defendant that you are considering, *agreed to violate federal law against murder in aid of racketeering*.
>
> And second, that the defendant knowingly and willfully became a member of the conspiracy.
>
> . . . .
>
> The burden is on the Government to prove each and every element. There are two, the existence of the conspiracy and the defendant's membership in it, beyond a reasonable doubt.

(emphasis added). These instructions arguably left the potential for the jury to misun-

derstand the nature of the § 1959 conspiracy charges against Gotti and Locascio. It should be noted, though, that these lapses came after the district court had already properly instructed the jury on the position-related motive requirement of § 1959. The jury did receive accurate instructions initially, although the district court proceeded to refer back to the motive requirement with the short-hand "in aid of racketeering" catch-phrase rather than the more precise "increase or maintain" language.

### (3) Conclusion

■ Gotti and Locascio argue that the vagueness in the instructions, caused by the district court's lapses into short-hand, constitutes reversible error. We note, though, that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). We disagree that the district court's charge was erroneous, because, even with the lapses, the instruction as a whole accurately charged the jury, especially considering that the court did properly impart the motive requirement numerous times and did give the jury the indictment, which also used the "increase or maintain" language.

■ Even if the district court had committed error in its instructions, however, the defendants failed to object to these aspects of the instructions at trial. Federal Rule of Criminal Procedure 30 provides that "[n]o party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." While defendants' own requested instructions contained the requisite position-related-purpose statements, a defendant's " 'requested instructions do not substitute for specific objections to the court's instructions.' " *United States v. Tannenbaum*, 934 F.2d 8, 14 (2d Cir.1991) (quoting *United States v. Graziano*, 710 F.2d 691, 696 n. 8 (11th Cir.1983), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984)). Although a "plain" error or defect affecting substantial rights of a party may warrant reversal of the conviction even though no objection was made in the trial court, *see* Fed.R.Crim.P. 52(b), the plain-error standard warrants reversal "solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982); *see United States v. Wilkinson*, 754 F.2d 1427, 1432 (2d Cir.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

■ Thus, even if we considered the instructions error, the failure of the defendants to object requires that we only examine the instruction for a miscarriage of justice. In light of the facts (a) that at the outset of its § 1959 instructions the district court properly instructed the jury as to the need to find a position-related motive, (b) that the jury was given a copy of the indictment, which correctly stated the motive requirement, (c) that the court advised the jury that it must determine whether or not the government had proven the conspiracy "as it is alleged in the indictment," and (d) that there was overwhelming evidence in the record to support a finding of such a motive, we cannot conclude that the court's short-hand summaries resulted in such a miscarriage of justice. A review of the charge in its entirety shows that the jury was well aware that it had to find that Gotti and Locascio were acting to advance their own positions within the criminal enterprise. The jury was free to accept Gotti's defense that the murders had been planned and committed only to further Gravano's interests, and simply rejected that theory.

We note, however, that it would have been preferable had the district court consistently reminded the jury that the motivation requirement applied to each § 1959 count.

### B. *The RICO "Pattern" Element*

■ Gotti also challenges the district court's instruction concerning the RICO pattern element. *See* 18 U.S.C. § 1962(c). The RICO pattern element requires that defendants commit at least two acts of racketeering that: (1) are related, and (2) amount to or pose a threat of continued criminal activi-

ty. *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). Gotti principally contends that the district court erred in instructing the jury on the relatedness requirement of the statute.

In describing the relatedness requirement, the district court instructed the jury as follows:

Before you can find a pattern of racketeering activity, you would have to find that the Government proved beyond a reasonable doubt that the two racketeering acts were interrelated, that is, that they were related to each other as well as related to the enterprise and that they posed a threat of continuing criminal activity.

Two racketeering acts that are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise.

The relationship between the RICO enterprise and the predicate racketeering acts may be established by evidence that the defendant you are considering was enabled to commit the racketeering acts solely by virtue of his position in the enterprise or involvement in or control over its affairs or by evidence that the predicate racketeering acts are related to the activities of that enterprise.

Gotti argues that the district court should have instructed the jury that it could not find the defendants guilty if it found that the racketeering acts charged in the indictment were committed exclusively for the individual's own purpose, not to further the goals of the Gambino Family. He points out that other circuits require that the racketeering acts further the affairs of the enterprise, not just relate to the enterprise. *See, e.g., United States v. Erwin*, 793 F.2d 656, 671 (5th Cir.), *cert. denied*, 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986); *Bank of America National Trust & Savings Association v. Touche Ross & Co.*, 782 F.2d 966 (11th Cir. 1986).

Gotti admits, however, that this Court does not impose such an "in the furtherance of" requirement. Rather, we have held that the relatedness requirement can be satisfied by proof that: (1) the defendant was enabled to commit the offense solely by virtue of his position in the enterprise; or (2) the offense was related to the activities of the enterprise. *See United States v. Robilotto*, 828 F.2d 940, 947–48 (2d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988); *United States v. LeRoy*, 687 F.2d 610, 617 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). Thus, under the law of this Circuit, it is not determinative that the defendant committed the crime to further his own agenda, if indeed he was only able to commit the crime by virtue of his position within the enterprise. The district court instructed the jury accordingly.

Gotti also argues that the district court erred in instructing on relatedness by failing to state that the predicate racketeering acts must be related both to each other and to the enterprise. Again, however, that is not the law of this Circuit. We have held that the relatedness requirement is satisfied even if the predicate acts are not *directly* related to each other so long as both are related to the RICO enterprise in such a way that they become *indirectly* connected to each other. *See United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 1511, 117 L.Ed.2d 648 (1992); *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir.1989) (in banc). The district court instructed accordingly.

## IV. *Locascio's "Mere Presence" Arguments*

Locascio was convicted for crimes stemming from his role as the "underboss" of the Gambino Crime Family. The government established at trial that Locascio's function as underboss was to advise Gotti in the formulation of plans for the Gambino Family's criminal activities. His conviction was principally grounded on his presence in the Ravenite Apartment during discussions about the crimes for which he was convicted, even though he did not personally discuss many of those crimes. The government's theory was that only involved members of the conspiracy would have been allowed to attend these Ravenite Apartment meetings. Moreover, the government argued that Locascio's role

as an advisor mandated that he not speak up at such meetings, unless it was to assist Gotti.

Locascio now argues that his culpability was presumed by his "mere presence" in the Ravenite Apartment and his mere exposure to conversations in which criminal conduct was discussed. Locascio contends that he was convicted not for his conduct but for his alleged position in the charged enterprise, which he argues essentially made him absolutely liable for anything that occurred. Therefore, he challenges both the sufficiency of the evidence against him and the district court's instruction that his "functional presence" in the Ravenite Apartment during discussions was sufficient to prove his participation in the various conspiracies.

### A. Sufficiency of the Evidence

Locascio's challenge to the sufficiency of the evidence carries, as we have often stated, a heavy burden. In reviewing such challenges, we view the evidence in the light most favorable to the government and credit every inference in its favor. See United States v. Skowronski, 968 F.2d 242, 247 (2d Cir.1992). Moreover, we will affirm the conviction if any jury could have found guilt beyond a reasonable doubt based on the reasonably drawn inferences from that evidence. See id. ("Any challenge to the weight of the evidence is for argument to the jury, not a ground for reversal on appeal."); see also Concepcion, 983 F.2d at 382.

Locascio argues that the only proof of his participation in the conspiracy was that he was present in the Ravenite apartment when some of the actions were discussed. Locascio asserts that his mere presence is not enough to prove participation. See United States v. Scarpa, 913 F.2d 993, 1004 (2d Cir.1990) ("[K]nowledge of the existence and goals of a conspiracy does not of itself make one a co-conspirator.").

Traditionally, conspiracy law has required more than "mere presence" or mere knowledge to sustain a conviction for conspiracy. See, e.g., United States v. Edwardo–Franco, 885 F.2d 1002, 1010–11 (2d Cir.1989) (holding that defendant who lived for twelve days in a

single room of a house found to contain drugs in basement could not be convicted of conspiracy to possess for mere presence in house); United States v. Nusraty, 867 F.2d 759, 764–65 (2d Cir.1989) (holding that mere presence at airport when acquaintance arrived carrying drugs could not justify conspiracy conviction); United States v. Soto, 716 F.2d 989, 991 (2d Cir.1983) (holding that defendant's presence in apartment in which drugs were found did not sufficiently support conviction). Rather, it is necessary for the government to introduce some evidence of participation in the conspiracy in order to sustain a conviction. See id.

Locascio, however, was not convicted for his mere presence. There is a distinction between "mere presence" and "presence under a particular set of circumstances" that indicate participation. See United States v. Gordils, 982 F.2d 64, 71 (2d Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993); United States v. Soto, 959 F.2d 1181, 1185 (2d Cir.1992). The distinction is that, although one's presence in a setting where a conspiracy is being conducted or discussed may not by itself connote participation, presence coupled with extrinsic factors can support such a finding. The circumstances under which one is present may imply involvement.

The distinction between "mere presence" and "presence under a particular set of circumstances" is illustrated by a comparison of the two United States v. Soto cases, which involve two separate litigants and were decided nine years apart. Locascio cites the first Soto opinion, in which we reversed a conviction for a woman charged with a conspiracy to distribute narcotics. See Soto, 716 F.2d at 990. In that case, there was no evidence other than her presence in an apartment in which drugs were found to prove her involvement in the conspiracy. The defendant's circumstances, however, were unique:

> While it would not be accurate to characterize Soto's presence at the apartment as merely transitory, we nevertheless consider the total circumstances of how Soto came to reside there to be highly significant. For here we have an individual newly arrived from Puerto Rico, accompanied

by a child of tender years, clearly in need of shelter. To this end, as soon as she arrived in New York defendant took up residence at the ... apartment. Although the living arrangements there may not have been ideal, there is no indication that defendant had any other alternative.

*Id.* at 991.

In contrast, the second *Soto* case involved a man who similarly argued that the facts only indicated that he was merely present in the apartment in which drugs and guns were found. *See Soto*, 959 F.2d at 1185. The Court noted that there was more than mere presence in that case, in that the facts indicated that the defendant was working at a crack packaging station, and that:

[t]he jury could also have reasonably determined that only trusted members of the operation would be permitted entry into the apartment, because allowing outsiders to have access to an apartment with large quantities of narcotics in plain view could compromise the security of the operation.

*Id.*

In the first *Soto* case, it was the lack of corroborating evidence, the fact that there was nothing other than her presence, that formed the basis for the Court's opinion. In contrast, the second *Soto* opinion demonstrates that presence coupled with other signs of involvement will be enough to sustain a conviction.

In this case, the evidence viewed in the light most favorable to the government indicates that, as the "underboss," Locascio was present to help evaluate plans presented to Gotti and give advice as needed. Gotti, Locascio, and Gravano took extensive but ultimately unsuccessful precautions to ensure that their conversations in the Ravenite Apartment, the conversations constituting the bulk of the evidence against them, were not overheard. Considering the precautions taken to ensure security, and after hearing the tapes of what was discussed in that apartment, the jury was entitled to consider whether it was likely that Locascio would have been present during those conversations if he were not a participant. Although Locascio's mere presence would not be sufficient to sustain his conviction, the government did far more than establish mere presence.

### B. *Jury Instruction*

■ Locascio argues that the district court improperly instructed the jury on conspiratorial liability. The instruction reads as follows:

Now, although mere presence or mere association with conspirators is not enough, it's a factor that you may consider among others to determine whether a defendant was a member of the conspiracy. The defendant's presence may establish his membership in a conspiracy, if all of the circumstances considered together show that his presence was meant to advance the goals of that conspiracy.

He must not only have been present, he must have known about the conspiracy, he must have intended by his presence to participate in the conspiracy or to help it succeed.

In other words, presence itself may demonstrate membership in a conspiracy only if that presence is a functional part of the conspiracy.

Locascio contends that this instruction improperly allowed the jury to convict him for his "mere presence." Considering the above discussion, however, it is clear that the district court quite properly instructed the jury that presence under circumstances that advance the purposes of the conspiracy would be sufficient to support a finding of guilt.

### V. *Prosecutorial Misconduct*

■ Gotti and Locascio argue that they are entitled to a new trial based on various remarks made by the government during the course of trial, remarks which they contend constitute prosecutorial misconduct. In asserting this claim, the defendants-appellants face a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of their right to a fair trial. *See Blissett v. Lefevre*, 924 F.2d 434, 440 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991). In evaluating such a claim, we consider: (1) the severity of

the alleged misconduct; (2) the curative measures taken; and (3) the likelihood of conviction absent any misconduct. *See id.*

██ Gotti and Locascio have raised numerous allegations of prosecutorial misconduct, most of which are not worthy of lengthy discussion. There is one instance, however, that merits some consideration. The United States Attorney for the Eastern District of New York at the time of the trial gave a rebuttal summation in which he made the following statement:

> Let me conclude with this. I want to talk about this briefly. I may be insulting some of you. I hope I'm not.

> If you accept the proof of what you are dealing with here, the boss of a murderous and treacherous crime family and his underboss, you would be less than human, if you didn't feel some personal concern—

The prosecutor was at that point interrupted by an objection, which was properly sustained by the district court.

There is no question that the remark was totally inappropriate, an intolerable attempt by the prosecution to instill fear of the defendants. The government now attempts to justify the remark by arguing that "it was made in the good faith belief in its propriety." The government cites to *United States v. Scarfo*, 850 F.2d 1015, 1024–26 (3d Cir.), *cert. denied*, 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988), to support its proposition that a statement addressing jurors' concerns for their personal safety is proper. In *Scarfo*, however, the Third Circuit merely affirmed a statement by the district court to the jury prior to trial addressing the reasons for sequestration, in order to dispel unnecessary and possibly prejudicial speculation.

There is a world of difference between a district court instructing the jurors that they should not be concerned for their personal safety, and a United States Attorney, in summation, telling the jurors that they would be "less than human" if they "didn't feel some personal concern." It is simply not the duty of the prosecutor to address the jury's potential security anxieties. Should the prosecutor—or, for that matter, the defense attorney—become concerned that a juror is undu-

ly concerned for personal safety, she can raise the issue before the district court. It is up to the judge to decide whether reassurance is needed.

The government also asserts in defense of the remark that statements made by a prosecutor in the course of trial must be evaluated in the context in which they are made. *United States v. Casamento*, 887 F.2d 1141, 1189 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). There is, however, no context in which a reference of this type is proper. Such remarks do much more to raise juror fears than quell them.

██ There is no question, then, that the remark at issue was indefensible. The only inquiry is whether it constitutes prosecutorial misconduct requiring reversal. We hold that reversal is not warranted. Although the statement potentially caused jurors to question their own safety, the fact that the district court immediately struck the remark mitigates the possible prejudice. *See id.* The transcript shows that the prosecutor immediately moved on to other areas, and it is likely that the jury did not even take notice of the intent and meaning of the safety reference. Most importantly, in view of all the evidence in this case, the likelihood that the remark had anything to do with the convictions is nonexistent. As noted earlier, the jurors did not robotically vote to convict the defendants on all charges, acquitting Locascio on one count. This indicates that the jury does not appear to have been influenced to deviate from its sworn duties. The conduct, therefore, was harmless.

## VI. *Sequestration*

██ Gotti argues that the sequestration of an anonymous jury denied him and Locascio a fair trial because of the district court's failure to adequately state the reasons for sequestration, and because of the prosecution's inflammatory use of the sequestration to influence the jury against Gotti.

In *United States v. Thomas*, 757 F.2d 1359, 1362–65 (2d Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985), we approved the sequestration of an anonymous

jury where the district court explained to the jurors that protective measures were necessary because of "considerable publicity" the case had generated among the "media and the public." *Id.* at 1365 & n. 1. We found that the explanation was "an intelligent, reasonable and believable explanation for his actions that did not cast defendants in an unfavorable light." *Id.* at 1364.

The district court in the instant case acted similarly, explaining to the jury that protective measures were needed because of undue publicity. The court did not tell the jury that those measures were needed to protect jurors from possible tampering by the Gambino Family. The district court did, however, explain to the defendants-appellants and the government that an additional reason for sequestration was the potential for tampering, specifically relying upon the government's evidence of previous instances of jury tampering by Gotti and his associates.

■ Gotti also contends that the prosecutor inflamed the jury against him by implying the real reasons for the security measures. In particular, Gotti cites: (1) the prosecutor's references to the jurors' oath to render a verdict "without fear or favor"; (2) the presence of FBI agents and United States Marshals in the courtroom; and (3) evidence introduced at trial about the Gambino Family's jury tampering and witness intimidation. Each of these actions, however, was justified: the prosecutor was simply reminding jurors of their oath; the presence of federal agents was necessary to ensure safety in the courtroom; and, finally, the evidence about jury tampering was admitted to prove the charges in the indictment, and was properly admissible for that purpose. None of these claims supports the argument that sequestration was in error.

## VII. *Severance*

■ Shortly before the start of trial, Locascio made a motion for severance to separate his trial from Gotti's. This motion was denied. Locascio made a second motion toward the end of trial, which was also denied. He now argues that the denial of these motions was error, and that he was unable to receive a fair trial as a co-defendant of Gotti's.

■ A motion for severance is committed to the sound discretion of the district court, and its disposition is virtually unreviewable on appeal. *See United States v. Lasanta,* 978 F.2d 1300, 1306 (2d Cir.1992). Locascio makes three different claims supporting his argument for severance: (1) the size of the case alone, and his relatively minor role; (2) "disparity of proof prejudice," based on the argument that the proof against Gotti was overwhelming while the proof against Locascio was marginal; and (3) "spillover prejudice," based on the volume of evidence introduced solely against Gotti and not against Locascio.

None of these arguments has merit. We have never recognized the need for severance based on the size of the trial. Even if we did, this case only involves two defendants, and Locascio was charged in eight of thirteen counts. As for the second argument, the disparity of proof prejudice, this Court has repeatedly recognized that joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible. *See, e.g., United States v. Scarpa,* 913 F.2d 993, 1014–15 (2d Cir.1990); *United States v. Cervone,* 907 F.2d 332, 341–42 (2d Cir.1990), *cert. denied,* 498 U.S. 1028, 111 S.Ct. 680, 112 L.Ed.2d 672 (1991). Again, Locascio was not a minor participant, and the majority of the counts involved him.

■ Finally, although this Court recognizes that "spillover prejudice" can require severance, the appellant alleging such prejudice bears a heavy burden. To succeed, Locascio must show that the spillover constituted a miscarriage of justice. *See Lasanta,* 978 F.2d at 1306. Locascio cannot meet that burden. The district court was careful to remind the jury to consider only evidence against Locascio in making its determination, and Locascio does not identify any evidence introduced that would have been inadmissible at a severed trial. Moreover, Locascio was acquitted of one charge, which indicates that the jury heeded the instructions from the district court and did not merely vote wholesale on all the charges.

## VIII. *Other Challenges*

Gotti and Locascio make numerous other challenges to their convictions. These include arguments that the district court improperly admitted evidence prejudicial to Gotti of other murders committed by Gravano, arguments concerning the government's failure to fulfill its disclosure obligations, and Locascio's challenge to the district court's denial of Locascio's request for a bill of particulars. We find these and the other challenges made to the disposition of the trial to be without merit and unworthy of further discussion.

## IX. *The New Trial Motion*

 Gotti and Locascio argue that they are entitled to a new trial based on information casting doubt on Gravano's credibility disclosed to them after the original trial.

### A. *Background*

Several months after Gotti and Locascio were sentenced, one of the prosecutors, preparing for a different trial, was reviewing reports of information obtained from Alphonse D'Arco, a government witness in another trial ("D'Arco report"). The D'Arco report had been prepared by government agents who were not involved in the instant case, and included allegations about Gravano. At the same time, the United States Attorney for the Eastern District of New York received from a prosecutor in another district an FBI report made in 1987 that also contained allegations about Gravano ("FBI report"). The FBI report had similarly been prepared by agents uninvolved in the investigation or trial of the defendants-appellants. Neither of these reports had been disclosed to the defense prior to the instant trial.

The D'Arco report included three separate uncorroborated allegations by D'Arco: (1) that Gravano had been responsible for the murder of Eddie Lino, a Gambino Family soldier; (2) that Gravano had "gotten to" (i.e., murdered) the prospective son-in-law of Nicky Corazzo; and (3) that Gravano had killed an individual named "Harold," who owned an establishment known as the Adventurer's Inn, because of a financial dispute.

The FBI report contained allegations made by an inmate at a federal prison. The inmate alleged that he had been told by another inmate, who had been told by yet another source, that an individual named either Salvatore Gravano or Gravatto had aided in the disposal of the body of Pietro Inzerillo.

Gravano, in his plea bargain, had not confessed to any of these crimes, even though his plea bargain stated that he had admitted all the crimes with which he was involved. He also testified at trial that he had only committed the crimes referred to in his plea bargain.

The government states that, upon receiving these reports, prosecutors asked Gravano if he had in fact committed any of the alleged crimes. Gravano denied involvement in them. The government then confirmed that no member of the prosecution team in the instant trial had been aware of either the reports or the allegations, and disclosed the allegations to defense counsel.

On October 22, 1992, six months after trial was completed, while their appeal was pending before this Court, Gotti and Locascio filed a motion in this Court to remand the appeal of their convictions in order to allow the district court to pass on a motion for a new trial pursuant to Fed.R.Crim.P. 33. The parties agreed that the district court would treat the new trial motion as filed in the district court. Gotti and Locascio raised two arguments: (1) that the two undisclosed reports demonstrated that the defendants-appellants had been convicted on the basis of Gravano's perjured testimony, since he had testified that he had committed no crimes except those admitted in his plea bargain; and (2) that the government had violated its discovery obligations by failing to disclose the allegations to the appellants.

The district court denied the motion for a new trial without an evidentiary hearing, finding that the information in the reports was untrustworthy and unsubstantiated, and that the government's failure to disclose the allegations to defense counsel did not violate the requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, the court ruled that the informa-

tion was neither known to the prosecutorial team nor exculpatory in nature, and stated that the information did not

> in any way tend to exonerate or exculpate either Gotti or Locascio of the crimes of which they were convicted. There is no dispute ·that at best, those reports would have provided trial counsel with an opportunity to cross examine Gravano about two more murders.

Following the district court's decision, the defendants-appellants obtained materials disclosed to the defense in another case. The information tended to bring into question the government's representation that no one on the trial team was aware of the D'Arco allegations against Gravano. The district court considered this information in a renewed motion for a new trial and without a hearing reaffirmed its earlier decision, relying on affidavits submitted by prosecutors denying that they had awareness of the allegations against Gravano.

Gotti and Locascio now appeal, arguing that the information: (1) indicates that Gravano perjured himself; and (2) should have been disclosed under *Brady* so that they could impeach Gravano, requiring a new trial. We note that Gotti and Locascio have raised in reply briefs yet another allegation of non-disclosed material, although this allegation was never heard by the district court.

### B. *Discussion*

 Federal Rule of Criminal Procedure 33 authorizes a district court to grant a new trial "if required in the interest of justice." Such authority is only exercised, however, in the most extraordinary circumstances. *See United States v. Imran,* 964 F.2d 1313, 1318 (2d ·Cir.), *cert. denied,* ── U.S. ──, 113 S.Ct. 626, 121 L.Ed.2d 558 (1992). A district court learning of newly discovered evidence after a conviction will only grant a new trial pursuant to Rule 33 if the evidence is material, noncumulative, and "would probably lead to an acquittal." *United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir.1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982); *see United States v. Siddiqi,* 959 F.2d 1167, 1173 (2d Cir.1992). We will not disturb the district court's findings of fact in these matters unless clearly erroneous, and we will not overturn the district court's decision except for an abuse of discretion. *See United States v. Gordils,* 982 F.2d 64, 72 (2d Cir.1992), *cert. denied,* ── U.S. ──, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993).

There was no such abuse of discretion here. Gotti and Locascio argue that the newly discovered reports concerning Gravano would· have made a difference at trial, and that the government had a *Brady* obligation to disclose them. However, as the district court found, these reports would have had no effect on Gravano's credibility, not only because they were untrustworthy, but also because they would merely have been cumulative. *See id.* (holding that new evidence impeaching key government witness's credibility did not require new trial because it was cumulative of evidence already introduced); *United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir.1981) (same), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982). Gravano had already confessed to numerous crimes, including murders, and was subject to withering cross examination for those actions. The addition of a few more allegations would not have materially affected the defense's cross examination of him.

Gotti and Locascio still maintain that, even if the evidence was cumulative, its suppression by the government requires a new trial. *See Brady,* 373 U.S. 83, 83 S.Ct. 1194; *United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir.1975) (permitting new trials where the prosecutor suppressed or failed to disclose evidence), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976). As the district court found, though, there was no suppression by the government. Even assuming the reports' materiality, there is no evidence that the prosecution team in the instant case was aware of the reports that have subsequently come to light. We will not infer the prosecutors' knowledge simply because some other government agents knew about the report. *See Morgan v. Salamack,* 735 F.2d 354, 358 (2d Cir.1984); *United States v. Quinn,* 445 F.2d 940, 944 (2d Cir.) (holding that knowledge on the part of one arm of government does not imply knowledge by the prosecutor),

*cert. denied,* 404 U.S. 850, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971). Moreover, the *Brady* argument defies logic. There would be no reason for the prosecution to withhold evidence of three or four more murders, considering that the jury had already heard evidence of 19 other murders committed by Gravano.

For these reasons, we hold that the district court did not abuse its discretion in denying the motion for a new trial and the renewed motion for a new trial. We will not consider the other allegations of non-disclosure made by Gotti and Locascio, for failure to raise those issues before the district court and make those allegations part of the record. *See United States v. Clements,* 992 F.2d 417, 420 n. 4 (2d Cir.1993). The defendants-appellants are therefore free to pursue the issue through whatever post-conviction remedies they may still have available to them. *See United States v. Bianco,* 998 F.2d 1112, 1115 (2d Cir.1993).

## CONCLUSION

Having considering all of the defendants-appellants' contentions, we affirm the judgment of the district court.

KEARSE, Circuit Judge, concurring:

I concur in the judgment and in most of the majority opinion. I disagree, however, with the majority's treatment of the trial court's instructions on the counts charging violations of 18 U.S.C. § 1959 (1988).

With respect to the counts charging substantive violations of § 1959, the trial court began by instructing the jury properly that it could not find a defendant guilty unless it found that he had committed the alleged murder "for the purpose of ... maintaining or increasing position" in the racketeering enterprise. As the majority recognizes, however, toward the end of this part of the instructions, the trial court began using a shorthand phrase, *i.e.,* murder "in aid of racketeering," which omitted reference to the position-related-purpose element of the offense. This omission also characterized the trial court's instructions on the counts charging conspiracy violations of § 1959.

In addition, the instructions on the § 1959 conspiracy charges, quoted in the majority opinion, contained a second flaw not discussed by the majority. In advising the jury that it was "enough" if the government proved that defendants agreed "to commit a crime to violate the law," for example, the court not only obscured § 1959's position-related-purpose requirement but also opened the door to verdicts of guilty on the basis that the defendants conspired merely to violate § 1959 or some other federal law, without having conspired to commit murder in order to maintain or increase their respective positions in the racketeering enterprise. To be sure, a conspiracy to violate § 1959 or any other federal statute would in itself be a crime, for it would violate 18 U.S.C. § 371 (1988), which prohibits conspiracy to commit an offense against the United States. A person may be guilty of conspiring to violate a given substantive section, however, without having performed all of the acts needed, or without possessing the motive needed, to consummate a violation of that section. For example, a conspiracy *to violate* § 1959 could encompass a conspiracy in which defendant X agreed to murder Y with the goal of assisting Z to improve Z's position in the racketeering enterprise. Though that conspiracy, assuming commission of an overt act in furtherance, would violate § 371, it would not be a conspiracy *in violation of* § 1959 as alleged in the present case, unless X was a member of the enterprise and also had the purpose of improving or increasing his own position in the enterprise. The *indictment in* this case did not charge a violation of § 371, and the quoted parts of the court's instructions were an inaccurate statement of what the jury needed to find in order to convict defendants of the alleged conspiracy in violation of § 1959. Advising the jury that one of the two essential elements of the § 1959 conspiracy offense was "conspiracy to murder in aid of racketeering" (the other element being that the defendant knowingly joined the conspiracy) and that it was "enough" if defendants had agreed to "to commit a crime to violate the law," did not inform the jury that, in order to convict under § 1959, it must find that defendants had conspired to commit murder in order to maintain or in-

crease their respective positions in the enterprise.

I concur in the judgment affirming the convictions, however, because defendants did not object to the erroneous parts of the trial court's instructions. Had they done so, the court would have had an opportunity to make, and no doubt would have made, the appropriate corrections. If defendants had objected and the trial court had refused to give corrected instructions, I would think the error a ground for reversal. In the absence of objection, however, and in light of the initial correctness of the instructions and the ample sufficiency of the evidence as to the position-related-purpose element, I do not conclude that the court's erroneous shorthand summaries constituted plain error or resulted in a miscarriage of justice. Accordingly, I concur in the judgment.